UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

EVERETT J. PRESCOTT INC.,            )
                                     )
            Plaintiff,               )
                                     )
      v.                             )            1:25-cv-00071-JAW
                                     )
TIMOTHY J. BEALL,                    )
                                     )
            Defendant.               )

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

A corporate plaintiff requests a temporary restraining order without notice pursuant to Federal Rule of Civil Procedure 65(b)(1), arguing a former employee has and continues to defame the company through public and private communications, tortiously interfere with its economic relationships, and intentionally inflict emotional distress on its employees.   Concluding the plaintiff has demonstrated a likelihood of success on the merits with regard to its defamation claim for public comments, the court orders the defendant temporarily restrained from making defamatory public comments on social media, but otherwise declines to grant the requested temporary restraining order because the plaintiff has not established his likelihood of success on the merits based on the limited record currently before the court.

## I.    BACKGROUND[1]

---

[1]    In ruling on the motion as quickly as possible, the Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored." *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).   In this order, the Court reviews the facts as pleaded in the verified complaint, which the Court takes as true for the purposes of the ruling on the request for temporary restraining order.   *See* FED. R. CIV. P. 65(b)(1) ("The court may issue a temporary

## A.    The Complaint

On March 3, 2025, Everett J. Prescott, Inc. (EJP or the Company) filed in this Court a civil complaint against former employee Timothy J. Beall, alleging harassment of the Company and its employees by Mr. Beall through threatening messages and defamatory statements on social media. *Verified Compl. for TRO and Other Relief* ¶¶ 1-3 (ECF No. 1) (*Compl.*).

EJP, a Maine corporation with a principal place of business in Gardiner, Maine, employed Mr. Beall, a resident of Shrewsbury, Massachusetts, as an inside sales representative from January 2, 2024 until his termination on November 6, 2024 for poor performance and violations of EJP's attendance policy. *Id.* ¶¶ 6-7, 10-11.

Since his termination, Mr. Beall has engaged in a pattern of harassment against current EJP employees, including an email sent to EJP Director of Human Resources Paul Van Savage on December 4, 2024 at 9:00 a.m., which read:

> I gave you multiple opportunities, and your demeanor just shows that you are not qualified for your position in the company (as[ ]well as countless other individuals) I feel bad for Peter that this great company he build was taken over by his spoon fed son who is going to allow his employees to destroy the name his father and grandfather built, but hey like I said previously, I tried to give you guys a change to make things right, thankfully there are laws and my lawyer has a LIST of them EJP violated and violates willingly his quote "it's hilarious how these large companies think the law doesn't matter, then they have their day in court and plead for mercy." He's an absolute pitbull, so we shall see. Be good Paul, see ya in court buddy (I'll be the one grinning from cheek to cheek)[.]

restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition"); *accord Alcom, LLC v. Temple*, No. 1:20-cv-00152-JAW, 2020 U.S. Dist. LEXIS 79863, at *3 n.1 (D. Me. May 6, 2020).

*Id.* ¶ 15.  On January 1, 2025 at 12:23 p.m., Mr. Beall sent another email to Mr. Van Savage, in this calling him derogatory names, making profane remarks about EJP, alleging legal violations and a cultural crisis within EJP, and threatening that he remained in contact with multiple customers despite his termination.  *Id.* ¶ 16.  In this communication, Mr. Beall invoked the January 6, 2021 "storming of the Capitol Building" and stating January 6, 2025 "will be a day in EJP history as well, when I file my first case in small claims court for something u still have yet to look into."  *Id.*

On January 25, 2025 at 10:47 a.m., Mr. Beall emailed Mr. Van Savage, again alleging a racist and unprofessional culture within EJP and threatening imminent legal action against EJP.  *Id.* ¶ 17.

On February 24, 2025, Mr. Beall began communicating through public comments on the LinkedIn social media platform, beginning with a comment on one of Mr. Van Savage's posts to the effect of:

> Workplace culture at EJP is having a BurgerKing crown be given to the employee with the most racist comment of the day at Branch 120. 614 Hartford Tpk Shrewsbury, MA.  Nepotism runs rampant at EJP, which is why James Peterson went from cleaning toilets at a campground to Branch Manager.  His uncle who has been ducking summons for a wrongful death case from an EJP employee since 2018 is the Operations Manager.  The Business Ethics are nonexistent in this company, that should have been the topic, not [E]mployee Retention.  But just like Team EJP to say about instead of be about it.  Preach family oriented company, then fire someone for attendance due to a court order to be in court for a case involving the safety of THEIR CHILD.  You are pathetic Paul, which is why you fit in so well within the culture at EJP[.]

*Id.* ¶ 18.  At the time of this public comment, Mr. Beall used a trademarked "Team EJP" logo as the banner photograph on his LinkedIn profile.  *Id.* ¶ 19.

On February 27, 2025, EJP sent a cease-and-desist letter through counsel to Mr. Beall "asking him to stop harassing Van Savage and to remove any defamatory public postings." *Id.* ¶ 20 (citing *id.*, Attach. 1, *Cease and Desist Defamatory and Harassing Commc'ns* (*Cease-and-Desist Letter*). That same day, at 3:07 p.m., Mr. Beall emailed EJP's counsel's paralegal, stating "EJP is full of cowards and the scum of the Earth. If you had any backbone and stood by the LAW you would not represent them, I have faith justice will prevail and if not on this Earth then God will sort it out when that time comes." *Id.* ¶ 21 (emphasis as recounted by Plaintiff). Then, at 3:42 p.m., again on February 27, 2025, Defendant emailed Plaintiff's counsel's paralegal for a second time, writing:

> Wait wait wait wait wait!!! That LinkedIn post is what this is referring to !!!!!?!?!?!? BAHAHAHAHAHAHAHAHHAAHAH OH MY GOD!!!! You have to be joking right? This is going to be laughable in court.. you understand that you are replying to allegations of sexual harassment and direct racism in the work place to an employee who is in a biracial family, WITH A CEASE AND DESIST?????!?!?! Hahahahahah you practice law?? Like seriously actually practice law? Every single page in this story just reveals more and more pre how obviously it is written as a comedy (by a 3rd grader). Thank you for this!! Thank you! I will go file my 7 lawsuits this week. Oh my God THANK YOU, you absolutely made my day!!!
>
> WOW! It's like I'm playing Tee-ball (as a 35 year old, against children), let me say it again……WOW!

*Id.* ¶ 22 (emphasis as recounted by Plaintiff). Five minutes later, at 3:47 p.m., Mr. Beall emailed Plaintiff's counsel's paralegal for a third time, criticizing the integrity of Plaintiff's counsel's law firm and Mr. Van Savage. *Id.* ¶ 23. Defendant sent another email to Plaintiff's counsel's paralegal at 5:20 p.m. on the same day, alleging corruption at EJP and stating his intent to imminently begin serving EJP employees

with summons relating to an alleged wrongful termination lawsuit. *Id.* ¶ 25. Still on February 27, 2025, at 7:50 p.m., Mr. Beall sent a final email to Plaintiff's counsel's paralegal, alleging, among other things, a culture of harassment, illegality, and nepotism at EJP and implying his possession of private information of EJP employees that he would expose in a lawsuit. *Id.* ¶ 28 (citing *id.*, Attach. 2, *External Email* (*Def.'s Emails to Paralegal*)).

Also on February 27, 2025, Mr. Beall sent a text message to EJP manager James Peterson, informing him of the Defendant's family connections in law enforcement and private investigations; calling Mr. Peterson "a sexual predator," "loser," and profane names; and threatening him with lawsuits. *Id.* ¶ 24. Mr. Beall concluded his message: "YOU PICKED THE WRONG GUY[.]" *Id.*

That same day, Defendant also a message to EJP President Steve Prescott at approximately 8:00 p.m., writing:

> I suggest you not be SHORT sighted, and get back to me by oh to make it fun let's say March 15th. With the amount of clowns you have working for you, the fact everything you have was given to you on a silver platter, and being from Maine I can assume you aren't the brightest, look up the Ides of March. Then look into your company, Branch 120, and James Peterson. You're welcome for the warning, it was more than that spineless Porto Potty scrubber James Peterson gave me, but when I bring him to court he will be UNEMPLOYABLE once he is exposed. Paul Van[ ]Savage's (also a tiny pos, there must be a farm up there that pumps you guys 12 out) knowledge of the allegations against James and the nothingness he has done about it is going to taint your company and last name, now that you are aware as[ ]well your next move will ultimately decide the fate of said company.

*Id.* ¶ 29. Plaintiff interprets Mr. Beall's reference to March 15 as an allusion to the Ides of March, the date on which Julius Caesar was assassinated. *Id.* The Defendant then sent another message to Mr. Prescott, again on February 27, 2025 around 8:00

p.m., insulting him, threatening litigation, and alleging sexual harassment of a female employee. *Id.* ¶ 30.

Lastly, on February 27, 2025, Defendant posted a public comment on EJP's Facebook page alleging EJP rewarded racist comments made in the workplace. *Id.* ¶ 26. He also changed his LinkedIn background photo to read: "Not EJP (They hire sexual predators and are run by corrupt little people)." *Id.* ¶ 27.

Based on "the volume of messages, their hostile tone, and the threats contained therein, including the veiled threat of death," EJP asserts that its employees and counsel "reasonably fear for their safety. *Id.* ¶ 31. Plaintiff also informs the Court that Mr. Beall's former spouse filed for divorce on November 8, 2024, and that Defendant is the subject of an Abuse Prevention Order from the Massachusetts Probate Court, which Plaintiff views as further evidence of Mr. Beall's "volatile and potentially violent nature." *Id.* ¶¶ 13, 14.

Incorporating these allegations, EJP first requests a temporary restraining order (TRO) and preliminary injunction, asserting Mr. Beall's actions have caused irreparable harm to EJP and its employees, he will continue to engage in such conduct without judicial intervention, and that EJP and its employees have suffered, and will continue to suffer, irreparable injury from Mr. Beall's continuing and mounting conduct.[2] *Id.* ¶¶ 33-37. The Company asserts granting a TRO would not cause

---

[2]      Plaintiff asserts its request for a TRO and preliminary injunction as Count I of their complaint; however, an injunction is a form of relief, not a standalone cause of action. *See, e.g.*, *Genesis Capital, LLC v. Lauravin Luxury Apartments Homes, LLC*, Civil Action No. 23-795 (JEB), 2023 U.S. Dist. LEXIS 84754, at * (D.D.C. May 15, 2023) ("Such an injunction is undoubtedly a 'remedy,' not a cause of action") (citing *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (describing preliminary injunction as "extraordinary remedy")). The Court thus considers the requested injunction as the relief sought pursuant to the Plaintiff's remaining claims. The Clerk of Court designated ECF No. 5 as the Motion

financial harm to the Defendant but would protect EJP's business and employees from future harm. *Id.* ¶ 38. EJP contends the Court may order a TRO without providing notice to Mr. Beall pursuant to Federal Rule of Civil Procedure 65(b)(1) and asks the Court to order a TRO immediately to prevent immediate injury and loss to the Company and its employees. *Id.* ¶¶ 39-40. EJP adds that there is a substantial likelihood of prevailing on its claims, that no remedy at law could fully compensate the Company for the harms occurring and threatened, and that the Company will provide a bond in any amount the Court deems necessary to support its requested TRO. *Id.* ¶¶ 42-44. Plaintiff concludes that it is entitled to a TRO and preliminary injunction "prohibiting Defendant from (a) contacting EJP's current employees in any form; (b) entering EJP's company premises; and (c) communicating with EJP or its employees through any means." *Id.* ¶ 45.

Turning to its first substantive cause of action, defamation per se, EJP alleges Mr. Beall "negligently, recklessly, and/or intentionally made false statements publicly on social media about EJP's reputation, business, and character," specifying that he "has falsely stated that EJP rewards racism, hires sexual predators, commits crimes, and aides and abets criminal activity." *Id.* ¶¶ 47-48. These public statements, Plaintiff says, "have a tendency to injure and have in fact injured EJP's reputation." *Id.* ¶ 49. As a direct and proximate result of Mr. Beall's statements, EJP asserts its professional standing has been injured and it has incurred damages. *Id.* ¶¶ 50-51.

---

for Temporary Restraining Order, incorporating the contents of the complaint. *See Mot. for TRO* (ECF No. 5).

As relief for its defamation claim, EJP requests an award of "compensatory damages, including lost earnings opportunities, attorney's fees and costs, and such other and further relief as the Court deems just and proper." *Id.* at 14.

Next, Plaintiff alleges Mr. Beall's conduct tortiously interfered with advantageous economic relationships with its existing and prospective clients. *Id.* ¶ 53. EJP alleges it had a reasonable expectation of continuing business relations with such clients and that Defendant engaged in tortious conduct "for the purpose of harassing and interfering with the conduct of EJP's business, and with intent to hinder, delay, prevent, threaten, intimidate, and put fear in EJP's employees." *Id.* ¶¶ 53-54. As a result, Plaintiff says, Mr. Beall has interfered with "the productivity and business expectancies between EJP and its employees, customers, suppliers, agents, and contractors," and these actions "have damaged, and . . . will continue to damage the existing and prospective contractual relationships or business expectancies of EJP." *Id.* ¶¶ 55-56. EJP adds that this interference has caused "actual, immediate, and irreparable harm for which EJP has no adequate remedy at law," and asks the Court to award a preliminary and permanent injunction and damages in an amount to be proven at trial. *Id.* ¶¶ 57-58.

EJP also brings a claim for intentional infliction of emotional distress (IIED), alleging that Mr. Beall "engaged in conduct that intentionally or recklessly caused emotion distress to Plaintiff and its employees" and that Defendant did so while "certain or substantially certain that severe emotional distress would result from his conduct." *Id.* ¶ 60. Plaintiff describes Mr. Beall's conduct as "atrocious,"

"outrageous," and "so extremely outrageous so as to exceed all possible bounds of decency." *Id.* ¶ 61. Defendant's action caused and continues to cause EJP and its employees "to suffer severe emotion[al] distress," such that EJP asks for damages "in an amount which will fairly compensate it for its damages, as well as punitive damages, and any other relief deemed just plus an award of costs and attorney's fees." *Id.* ¶ 62 and 16.

Plaintiff's complaint concludes with a request for six separate bases of relief. First, EJP asks the Court to enjoin Mr. Beall from "a) Contacting EJP's current employees in any form; b) Entering EJP's company premises; c) Communicating with EJP or its employees (or outside counsel's employees) through any means; and d) Posting any defamatory content on public social media sites." *Id.* at 16. Second, it requests the Court set a hearing to extend the TRO to a preliminary injunction of the same list of actions for the pendency of this action. *Id.* Third, Plaintiff asks for a permanent injunction of the same conduct. *Id.* at 17. Fourth, Plaintiff asks for the Court to issue an order requiring all federal law enforcement officers to enforce the injunction "to the extent of their lawful authority." *Id.* Fifth, EJP requests an award of reasonable attorney's fees and costs. *Id.* Sixth, Plaintiff asks for any other relief the Court deems appropriate. *Id.* As a final note, the Company also requests a jury trial on all issues for which a jury trial is permissible. *Id.*

### B.    The Rule 65(b)(1)(B) Notice Certification

On March 4, 2025, Plaintiff filed a notice certification pursuant to Federal Rule of Civil Procedure 65, informing the Court of its efforts to provide notice to the

Defendant and justifying its request for the Court to enter a TRO without prior notice to Mr. Beall. *Rule 65(b)(1)(B) Notice Certification* (ECF No. 6) (*Rule 65 Notice*).

Plaintiff first tells the Court that, prior to filing the complaint, Plaintiff's counsel on February 28, 2025 contacted the attorneys Mr. Beall had alleged represented him: Aloise and Wilcox, P.C. of Worcester, Massachusetts. *Id.* ¶ 2. However, Attorney Wilcox informed Plaintiff's counsel that they did not currently represent Mr. Beall and could not accept service for him. *Id.*

Nonetheless, Plaintiff believes Aloise and Wilcox, P.C. may have given Mr. Beall notice that a complaint was forthcoming because at 9:16 a.m. on March 1, 2025, Mr. Beall sent a Facebook message to Mr. Prescott, insulting him with profane language and threatening "to destroy [his] company and [his] father's legacy." *Id.* ¶ 3.

On March 3, 2025, Mr. Van Savage reported Mr. Beall's conduct to the Shrewsbury, Massachusetts Police Department, which subsequently attempted to contact the Defendant. *Id.* ¶ 4. That same evening, Mr. Beall emailed Mr. Savage profane insults at 8:01 p.m. and again in a separate email at 8:06 p.m., asserting in the latter that Plaintiff will "have a harder time finding [Defendant] than the courts did to serve Dave the wrongful death paperwork" and adding "I know where you all live, he will be getting served[,] bet on that." *Id.* ¶¶ 4, 5.

Plaintiff tells the Court that it continues to work with the Worcester, Massachusetts Sheriff's Department to serve Mr. Beall with the complaint. *Id.* ¶ 6. However, EJP continues to assert service prior to entry of a TRO is infeasible due to

"Defendant's escalating threats of violence, his assertion that he no longer lives at his last known address, and his statement that he plans to evade service." *Id.* ¶ 7. Further, EJP claims it has not emailed the Complaint to Mr. Beall for fear that it may "cause[] him to further hide from service as well as fears that doing so might drive him to acts of violence prior to the TRO being in place." *Id.* ¶ 8. If the Court grants its motion and orders TRO, however, Plaintiff asserts it will promptly email the order to Defendant. *Id.* ¶ 9.

## II.    LEGAL STANDARD

The standard for issuing a temporary restraining order is the same as for a preliminary injunction and is provided by traditional equity doctrines. *Aftermarket Auto Parts Alliance, Inc. v. Bumper2Bumper, Inc.*, Civil No. 1:12-cv-00258-NT, 2012 U.S. Dist. LEXIS 143685, *3 (D. Me. Oct. 4, 2012); *accord* 11A WRIGHT, MILLER & KANE § 2942, at 37; *Alcom, LLC v. Temple*, No. 1:20-cv-00152-JAW, 2020 WL 2202443, at *5 (D. Me. May 6, 2020) (collecting cases).

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *accord Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981) ("The authority of the District Court Judge to issue a preliminary injunction should be sparingly exercised")). "In order for a court to grant this type of relief, a plaintiff 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to

11

suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that the injunction is in the public interest." *Id.* (quoting *Winter*, 555 U.S. at 20). "The party seeking the preliminary injunction bears the burden of demonstrating that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "[T]rial courts have wide discretion in making judgments regarding the appropriateness of" preliminary injunctive relief. *Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2010).

## III.    DISCUSSION

### A.    Likelihood of Success on the Merits

The First Circuit has observed that likelihood of success on the merits is both the "sine qua non" and the "most important part of the preliminary injunction assessment," explaining that "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7, 10 (1st Cir. 2012) (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2008); *New Comm Wireless Servs. Inc. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). To carry his burden on this factor, the Plaintiff "must establish a 'strong likelihood' that he will ultimately prevail." *Id.* at 10 (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)). The Court thus considers each of the Plaintiff's substantive causes of action in turn for their likelihood of success.

### 1.    Defamation Per Se

#### a.    Legal Elements

According to the Maine Supreme Judicial Court, sitting as the Law Court, the elements of a defamation claim are:

> (1) a false and defamatory statement concerning another;
>
> (2) an unprivileged publication to a third party;
>
> (3) fault amounting at least to negligence on the part of the publisher; [and]
>
> (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Garey v. Stanford Mgmt., LLC*, 2024 ME 46, ¶ 8, 319 A.3d 1022 (citing *Waugh v. Genesis Healthcare LLC*, 2019 ME 179, ¶ 10, 222 A.3d 1063) (alteration in original)). To constitute defamation, "the statements must be more than mere opinions and constitute either explicit or implicit assertions of fact"; however, "an opinion implying the existence of undisclosed defamatory facts does not escape liability." *Id.* (citing *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991); *Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 784 (Me. 1984)).

Such statements, when "written falsely about a person's profession, occupation, or official station constitute [defamation] per se." *Id.* (quoting *Ballard v. Wagner*, 2005 ME 86, ¶ 10, 877 A.2d 1083).  In the defamation per se context, "a plaintiff need not prove special damages or malice in order to recover a substantial award." *Marston v. Newavom*, 629 A.2d 587, 593 (Me. 1993) (citing *Saunders v. VanPelt*, 497 A.2d 1121, 1126 (Me. 1985)).  Rather, in such cases, "[i]njury to

reputation and injury to feelings may be presumed from the publication of the defamatory statement." *Id.*

> **b.    Analysis**
>
> > **i.    False and Defamatory Statements Concerning Another**

Assuming, for the purposes of the requested TRO, the truth of the factual allegations in the verified complaint, the Court considers whether the Company has alleged Mr. Beall made statements that were false and "tend[] . . . to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Bakal v. Weare*, 583 A.2d 1028, 1029 (Me. 1990) (quoting Restatement (Second) of Torts § 559 (AM. L. INST. 1977)).

The question of falsity can be easily resolved based on the plain language of the verified complaint; EJP alleges that Defendant's public comment on LinkedIn on February 24, 2025 "falsely accusing EJP of condoning racism, falsely accusing an EJP employee of committing a crime, and falsely accusing EJP of preventing him from attending court," and that his public comment on EJP's Facebook page on February 27, 2025 "falsely accus[ed] EJP of rewarding racism in the workplace." *Compl.* ¶¶ 18, 26. EJP incorporates these allegations in its defamation count, and additionally clarifies that "Defendant has falsely stated that EJP rewards racism, hires sexual predators, commits crimes, and aides and abets criminal activity." *Id.* ¶ 48. The Court thus concludes that EJP has sufficiently alleged false statements made concerning another—here, EJP—and turns to consider whether these false statements were defamatory.

As noted above, the Law Court has adopted the definition of a "defamatory communication" from the Restatement (Second) of Torts, which writes: "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (AM. L. INST. 1977). The Restatement (Second) continues to explain that "[t]he question to be determined is whether the communication is reasonably understood in a defamatory sense by the recipient." *Id.* § 563 cmt. c. The Restatement (Second) further defines defamatory conduct specifically in the context of a corporation as "if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it." *Id.* § 561(a); *accord Bruno v. Corrado*, No. CV-14-429, 2015 Me. Super. LEXIS 12, at *7-8 (Jan. 5, 2015) (quoting Restatement (Second) of Torts § 561).

In this case, the question is whether EJP reasonably understood Mr. Beall's allegations of rewarding racism, supporting criminality, and engaging in sexual harassment and abuse to have deleterious effects on EJP's reputation. On this question, the Court concludes Plaintiff has plainly demonstrated its belief that Mr. Beall's statements injured its reputation through its assertions that his statements "have a tendency to injure and have in fact injured EJP's reputation" and its claim that "EJP has been injured in its professional standing and reputation." *Compl.* ¶¶ 49, 50. The Court also agrees with EJP that perception of the effect of Mr. Beall's public remarks would reasonably affect its reputation. It is logical that the

community would think negatively and seek to avoid doing business with a company accused of supporting a culture of racism, sexual harassment, and criminality.

## ii.    Publication to Third Party

Section 577 of the Restatement (Second) of Torts, which has been adopted by the Law Court, states "[p]ublication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." Restatement (Second) of Torts § 577; *see also Heselton v. Wilder*, 496 A.2d 1063, 1067 (Me. 1985) (citing Restatement (Second) of Torts § 577); *Bedard v. Greene*, 409 A.2d 676, 678 n.4 (Me. 1979) (same).

As alleged in the complaint, Mr. Beall made three types of statements: public comments on social media, emails to Plaintiff's counsel's paralegal, and direct messages to EJP employees.

The Court concludes this element of defamation per se is unquestionably met regarding the public comments made by Mr. Beall on the LinkedIn and Facebook social media profiles of EJP. These platforms are inherently public-facing, such that Mr. Beall's statements, including his allegations that the Company "hire[s] sexual predators and are run by corrupt little people," that they reward racist conduct, and that their corporate culture encourages nepotism and illegality, were published to one other than the person being defamed. *See Compl.* ¶¶ 18, 26-27.

Statements made to EJP's counsel through its paralegal, however, raise a separate issue. As noted above, to constitute defamation, the false statement must be made to a third party and cannot be made only to the person being defamed. Here,

Plaintiff's counsel, through its paralegal, was acting on behalf of EJP in sending the cease-and-desist letter that prompted the responsive emails from Mr. Beall. *See Cease-and-Desist Letter*. Maine caselaw is clear that, when a lawyer acts on behalf of a client, the lawyer appears as an agent of the client. *Cf. Berman v. Griggs*, 145 Me. 258, 262-63; 75 A.2d 365, 367 (1950) (law of principal and agent applies when lawyer acts on behalf of client); *Mockus v. Melanson*, 615 A.2d 245, 247 (Me. 1992) (attorney's actions "are to be regarded as the acts of the party represented"). Thus, Mr. Beall's statements responding to Plaintiff's counsel, through its paralegal, were functionally made to EJP itself. Under defamation law of the state of Maine, a defamatory statement is only "published" if made to "one other than the person defamed." Restatement (Second) of Torts § 577.[3]

This logic extends to Mr. Beall's messages directly to EJP employees. Statements implicating the corporate culture and professionalism of EJP and certain employees were made directly to the implicated employees, and only those employees. Plaintiff has presented no evidence these messages were communicated to "one other than the person being defamed." Restatement (Second) of Torts § 577. Specifically, Mr. Beall's emails to Mr. Van Savage on December 4, 2024, January 1 2025, and January 25, 2025 made allegations against EJP's Human Resources Department, headed by Mr. Van Savage himself. *Compl.* ¶¶ 15-17. Further, Mr. Beall's messages

---

[3]    Whether the publication requirement can be met when an otherwise defamatory statement is made in direct communications with the victim's attorney is not obvious and has not been addressed by EJP counsel. Before issuing a TRO, the Court must be satisfied that the movant has a likelihood of success. Based on the existing record, the Court cannot conclude that a defamatory statement against a victim has been published when made to the victim's attorney.

on February 27, 2025 accusing Mr. Peterson of sexual misconduct and threatening legal action were sent directly and exclusively to Mr. Peterson. *Compl.* ¶¶ 24, 30. Similarly, Mr. Beall's message to Mr. Prescott, EJP President, on February 27, 2025 alleging mismanagement of the Company was sent to the leader of the Company, and thus was not published to a third party audience outside of EJP in a manner that would affect the Company's public reputation. *Compl.* ¶ 29.

For these reasons, the Court concludes Mr. Beall's public comments on LinkedIn and Facebook likely satisfy the standard for publication to a third party, whereas his emails to Plaintiff's counsel, through its paralegal, and direct messages to EJP employees do not.

### iii.    Fault Amounting to At Least Negligence

Restatement (Second) of Torts § 580B governs the degrees of fault that must be alleged with regard to defamation of a private person, as opposed to a public official or public figure. *Compare* Restatement (Second) of Torts § 580B ("Defamation of Private Person") *with* Restatement (Second) of Torts § 580A ("Defamation of Public Official or Public Figure"). Section 580B contemplates liability if defamatory statements are made under three circumstances: the speaker "(a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." Restatement (Second) of Torts § 580B.

In this case, it seems undeniable that Mr. Beall made his statements intentionally. As previously explained, the Court takes the factual allegations of the

verified complaint as true for the purposes of the requested TRO.  Here, then, the question is whether Mr. Beall knew his statements regarding racist workplace culture, sexual harassment, and nepotism at EJP were false at the time he made the statements, or, alternatively, whether he acted recklessly or negligently in ascertaining their truth.  Section 580B of the Restatement (Second) incorporates the standard for "knowledge or reckless disregard of falsity" from comment (d) to Restatement (Second) of Torts § 580A, which itself states:

> Reckless disregard is held not to be measured by whether a reasonable, prudent person would have published the statement without more investigation. Reckless disregard is said to exist, however, when there is "a high degree of awareness of . . . probable falseness" of the statement, or there are "serious doubts as to [its] truth." Availability of sufficient time and opportunity to investigate the truth of the statement is a significant factor in determining whether the publisher was negligent . . ., and it may have some relevance in determining whether the publisher acted with reckless disregard as to truth or falsity.

Restatement (Second) of Torts § 580A cmt. d.  The comment continues to explain that "[r]epublication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard."  *Id.*

Here, Mr. Beall published his first LinkedIn comment on Mr. Van Savage's LinkedIn page on February 23, 2025, after which EJP sent him a cease-and-desist letter informing him of the falsity of his allegations and demanding he stop making such comments.  *Cease-and-Desist* Letter at 1-4.  In response, on February 27, 2025, Mr. Beall changed his LinkedIn background image to accuse EJP of "hir[ing] sexual predators and [being] run by corrupt little people," *id.* ¶ 27, and made additional public comments to the same effect on Facebook.  *Id.* ¶ 26.  As explained by the

Restatement (Second), republishing a statement after being informed of its false and defamatory nature may be taken as evidence of reckless disregard for its falsity. Restatement (Second) of Torts § 580A cmt. d.  The Court thus concludes that EJP has sufficiently established, for the purposes of a TRO, that Mr. Beall published his defamatory statements on LinkedIn and Facebook with reckless disregard as to their truth or falsity.

### iv.    Special Harm

Regarding defamation per se, Maine courts have repeatedly held that for statements "written falsely about a person's profession, occupation, or official station," "[i]njury to reputation and injury to feelings may be presumed from the publication of the defamatory statement."  *See, e.g., Ballard*, 2005 ME 86, ¶ 10, 877 A.2d 1083; *Marston*, 629 A.2d at 593 (citing *Saunders*, 497 A.2d at 1126).  As quoted in part above, the Restatement (Second) of Torts also specifically addresses reputational harm in the context of corporations, writing "[a] corporation for profit has a business reputation and may therefore be defamed in this respect.  Thus a corporation may maintain an action for defamatory words that discredit it and tend to cause loss to it in the conduct of its business, without proof of special harm resulting to it."  Restatement (Second) of Torts § 561 cmt. b; *see Bruno*, 2015 Me. Super. LEXIS 12, at *7-8.

Mr. Beall's statements plainly implicated EJP's professional reputation by alleging serious violations of both workplace ethics and the law.  *See, e.g., Compl.* ¶¶ 15-30.  Therefore, in accordance with well-established Maine precedent and the

Restatement (Second), the Court concludes it may presume injury to reputation and feelings based on the content of Mr. Beall's statements, such that EJP has satisfied its burden of demonstrating harm for the purposes of its defamation per se claim in the context of its requested TRO.

### c.    Conclusion

At bottom, the Court concludes EJP has demonstrated a likelihood of its success on the merits for its defamation per se claim with regard to Mr. Beall's public-facing statements on LinkedIn and Facebook.  His statements made directly to Plaintiff's counsel, through its paralegal, and to EJP employees, however, have not been proven likely to succeed on the merits of a defamation per se claim for lack of publication based on the record currently before the Court.

### 2.    Tortious Interference with Advantageous Economic Relationship

### a.    Legal Elements

To plead a claim for tortious interference with advantageous economic relationship, a plaintiff must establish "interference with an advantageous relationship requires the existence of a valid contract or prospective economic advantage, interference with that contract or advantage through fraud or intimidation, and damages proximately caused by the interference." *Barnes v. Zappia*, 658 A.2d 1086, 1090 (Me. 1995); *accord Harlor v. Amica Mut. Ins. Co.*, 2016 ME 161, ¶ 12, 150 A.3d 793.

In *Harlor*, the Law Court clarified that "a plaintiff can make out a claim for this tort by alleging either (a) that the defendant interfered with the plaintiff's

advantageous relationship with a third party by committing fraud or intimidation against the third party or (b) that the defendant interfered with the plaintiff's relationship with a third party by committing fraud or intimidation against the plaintiff." *Harlor*, 2016 ME 161, ¶ 13, 150 A.3d 793 (citing *O'Donnell v. Boggs*, 611 F.3d 50, 54 (1st Cir. 2010); Restatement (Second) of Torts §§ 766A, 766B (AM. LAW INST. 1979)).

Section 767 of the Restatement (Second) provides factors to evaluate the propriety of intentional interference with the contractual relations of another, which include "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." Restatement (Second) of Torts § 767.

              **b.**    **Analysis**

                  **i.**    **Existence of Contract or Prospective Advantage**

EJP asserts it "has a reasonable expectation of continued business relations with its existing and prospective clients" and claims Mr. Beall's statements "tort[i]ously interfered with the productivity and business expectancies between EJP and its employees, customers, suppliers, agents, and contractors." *Compl.* ¶¶ 53, 55. For the purposes of this TRO, the Court accepts as true EJP's assertion that it has

contracted with customers and anticipates prospective contracting opportunities as the purpose of the Company.

### ii.    Interference Through Fraud or Intimidation

The *Harlor* Court clarified the requisite elements for proving interference through fraud or intimidation.  For interference by fraud, the *Harlor* Court explained, a person must "(1) make[] a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing another to act or to refrain from acting in reliance on it; and (5) the third person . . . justifiably relies on the representation as true and acts upon it, damaging the plaintiff."  *Harlor*, 2016 ME 161, ¶ 34, 150 A.3d 793 (citing *Petit v. Key Bank of Me.*, 688 A.2d 427, 430 (Me. 1996)).  Here, the Court considers the final element dispositive of a potential fraud claim; Plaintiff alleges no facts supporting the conclusion that any third person has relied on Mr. Beall's statements to cancel an existing contract or refuse to enter a prospective contract.  While it takes the facts of the verified complaint as true for the purposes of the requested TRO, the Court cannot conclude without evidence that any third parties have been defrauded by Mr. Beall and thus does not proceed to consider the remaining factors for interference through fraud.

Turning to interference by intimidation, the *Harlor* Court explained the requisite conduct as when a person "(1) communicates a statement or threat to a third person . . .; (2) that suggests adverse physical, economic, or emotional consequences to the third person; (3) for the purpose of inducing the third person to act or fail to act

regarding the plaintiff . . .; and (4) the third person acts based on the statement or threat, damaging the plaintiff. *Id.* at ¶ 35, 150 A.3d 793 (quoting *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶¶ 31-33, 915 A.2d 400). As with interference by fraud, the Court concludes EJP's interference by intimidation claim may be resolved at this stage based on the final element alone, which requires a showing that a third party has acted based on the intimidating statement to the effect of injuring the plaintiff. Here, despite Plaintiff's conclusory assertion that Mr. Beall's statements have damaged "the existing and prospective contractual relationships or business expectancies of EJP," *Compl.* ¶ 56, the complaint contains no factual allegations to support the conclusion that any existing third-party contracts have been cancelled or prospective business opportunities have been lost on the basis of Mr. Beall's statements. Without factual allegations supporting this assertion, the Court cannot conclude EJP has "clearly shown" tortious interference through intimidation with an advantageous economic relationship.

### c.    Conclusion

In sum, the Court concludes, for the purposes of the requested TRO, that the Company has failed to demonstrate a likelihood of success on its tortious interference with an advantageous economic relationship claim.

### 3.    Intentional Infliction of Emotional Distress

### a.    Legal Elements

To prove a claim of intentional infliction of emotional distress, a plaintiff must present factual support for each of the following:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable person could be expected to endure it."

*Curtis v. Porter*, 2001 ME 158, ¶ 16, 784 A.2d 18 (citing *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 15, 711 A.2d 842); *accord Bratton v. McDonough*, 2014 ME 64, ¶ 22, 91 A.3d 1050. "The determination of whether the facts alleged are sufficient to establish that the defendant's conduct is 'so extreme and outrageous to permit recovery' is a question of law for the court to decide." *Argereow v. Weisberg*, 2018 ME 140, ¶ 27, 195 A.3d 1210 (quoting *Champagne*, 1998 ME 87, ¶ 16, 711 A.2d 842).

The First Circuit has further clarified that "[b]ecause corporations, unlike natural persons, have no emotions, they cannot press claims for intentional infliction of emotional distress." *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 n.2 (1st Cir. 2000).

### b.    Analysis

The Court concludes, as a threshold matter, that EJP has failed to establish its likelihood of success on the merits of its IIED claim for reason of lack of standing, which courts are authorized to raise sua sponte at any time during a proceeding. *See, e.g.*, *Collins v. State*, 2000 ME 85, ¶ 5, 750 A.2d 1257 ("We can raise the issue of standing sua sponte as it is jurisdictional"); *accord Dyer v. Harris*, No. 2:24-cv-00353-NT, 2024 U.S. Dist. LEXIS 199547, at *1-2 (D. Me. Nov. 4, 2024) ("Issues of subject matter jurisdiction 'can be raised sua sponte at any time' because they relate to the

fundamental Article III limitations on federal courts. Standing 'is a prerequisite to a federal court's subject matter jurisdiction.'") (first quoting *McBee v. Delica Co.*, 417 F.3d 107, 127 (1st Cir. 2005), then quoting *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016)).

First Circuit precedent plainly restricts IIED claims to natural persons because corporations do not have emotions and thus cannot claim emotional distress. *Dynamic Image Techs., Inc.*, 221 F.3d at 37 n.2. This limitation on the availability of IIED claims to natural persons is also broadly reflected across other federal districts. *See, e.g.*, *Tekdoc Servs., LLC v. 3i-Infotech Inc.*, No. 09-6573 (MLC), 2012 U.S. Dist. LEXIS 115728, at *59 (D.N.J. Aug. 16, 2012) (collecting cases from the First, Tenth, and Eleventh Circuits which concluded a corporation cannot suffer emotional distress).

Here, the only plaintiff in this case is EJP, self-described as "a Maine corporation with its principal place of business in Gardiner, Maine." *Compl.* ¶ 6. Based on clear First Circuit precedent foreclosing a corporation's assertion of emotional distress, EJP cannot satisfy the injury in fact requirement of the standing analysis. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, (1992) (to invoke federal jurisdiction, a party must establish: (1) an injury in fact that is concrete and particularized, and actual or imminent, not merely conjectural or hypothetical; (2) a causal connection between the injury and conduct complained of; and (3) a likelihood,

as opposed to mere speculation, that the injury could be redressed with a favorable decision).

The Court also considered whether EJP qualifies for third party standing on behalf of its allegedly injured employees. The First Circuit has described third party standing as an "isthmian exception" which "permit[s] one to assert another's rights in circumstances where 'some barrier or practical obstacle deters a third party from asserting its rights.'" *Freeman v. Town of Hudson*, 714 F.3d 29, 39 (1st Cir. 2013) (quoting *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 49 (1st Cir. 2005)). However, here, as in *Freeman*, "there is no allegation that the [third party] is incapable of asserting his or her own rights, and therefore we lack jurisdiction over this claim." *Id.* This conclusion further aligns with caselaw from numerous other federal courts which "have concluded that the employer-employee relationship does not meet the requirements for third-party standing." *N.Y. State Vegetable Growers Ass'n v. James*, 2024 U.S. Dist. LEXIS 29743, at *5-6 (W.D.N.Y. Feb. 21, 2024) (collecting cases from the Sixth, Seventh, and Eleventh Circuits rejecting third party standing of an employer on behalf of its employees).

The Court thus concludes EJP is unlikely to succeed on the merits of its IIED claim for lack of standing and declines to consider the substantive elements of the claim.

### c.    Conclusion

Based on threshold standing issues, the Court concludes that EJP has not established in the current record a likelihood of success on the merits of its IIED claim.

Having resolved the question of likelihood of success on the merits for each substantive cause of action, the Court now turns to considering the remaining factors relevant to issuing a TRO, which are considered in light of the requested relief and thus have not sub-divided into particular counts as in the previous section.

### B.    Likelihood of Irreparable Harm

Plaintiffs seeking preliminary injunctive relief must demonstrate "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "[I]rreparable harm can consist of 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'" *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (*Ross-Simons II*) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (*Ross-Simons I*)). "[D]istrict courts have broad discretion to evaluate the irreparability of alleged harm." *Ross-Simons II*, 217 F.3d at 13) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989)).

In this case, EJP asserts Mr. Beall's statements cause "harm to its goodwill and business expectations, which will continue during the pendency of this matter if Defendant is not enjoined from further unlawful conduct." *Compl.* ¶ 35. Recently considering a claim of irreparable injury by a corporate plaintiff, this Court wrote:

> While injury to a business's reputation or goodwill is often cited as irreparable because it is generally difficult to quantify, and although something of a sliding scale sometimes operates in relation to an especially strong showing on the merits, to truly be irreparable this kind of injury should ordinarily be capable of description as profound and threatening to the business's continued viability, or at least seriously disruptive to the ordinary operation of the market for its services.

*Curo Health Serv. LLC v. Lilly*, No. 1:24-cv-417-LEW, 2024 U.S. Dist. LEXIS 233767, at *9 (D. Me. Dec. 30, 2024) (citing *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (collecting exemplar cases)).  In the case at bar, the Court sees the force in EJP's concerns that allegations of corruption, nepotism, racism, and sexual harassment at the Company would seriously disrupt the market for its services.  It is undeniable that a corporate reputation and client relationships take time and effort to develop, and even a hypothetical future dismissal of allegations may not serve to rebuild goodwill with existing or potential clients that was affected by the initial allegations.  In *Curo*, this Court declined to issue a preliminary injunction on the basis that, should liability be proven, "a damages remedy could be computed and awarded" by determining the costs related to "the loss of a hospice patient it was otherwise prepared to serve." *Id.* at *14.  It is true that, should existing EJP contracts be cancelled on the basis of Mr. Beall's statements, the associated economic damages could be readily calculated.  However, prospective contracting opportunities, deterred by Mr. Beall's allegations, would be extremely challenging to accurately quantify.  This incalculable and irreparable harm cuts in favor of Plaintiff's requested TRO.

In sum, the Court concludes that EJP has demonstrated the likelihood of irreparable reputational harm, absent its requested injunctive relief, that weighs in favor of the requested TRO.

## C.    The Balance of the Equities

To obtain preliminary injunctive relief, a Plaintiff must also show "the balance of equities tips in [its] favor." *Winter*, 555 U.S. at 20.  This involves weighing "the balance of relevant hardships as between the parties." *Vaqueria Tres Monjitas, Inc.*, 587 F.3d at 482.

Plaintiff asserts a TRO would "not cause financial loss or damage to Defendant but will protect EJP's business and its employees from further irreparable harm." *Compl.* ¶ 38.  As discussed above, the Court sees the merit in EJP's contention that Mr. Beall's allegations interfere with its ability to conduct a profitable business and may cause reputational harm that will be difficult to undo, even if the Plaintiff eventually wins in court.

Further, the Court struggles to speculate any significant hardships that awarding an injunction would impose on Mr. Beall.  While a TRO would maintain the status quo until the Court can evaluate the propriety of more permanent injunctive relief by considering a more robust record, it would not prejudice Mr. Beall from bringing the lawsuits he implicates in his messages, nor would it interfere with any apparent economic interests.  Indeed, the only purpose of the defamatory conduct the Court can discern is to threaten and insult EJP and its employees.  It is true that a restriction on speech implicates Mr. Beall's First Amendment rights.  However, for

several reasons, the Court concludes the balance of the equities favors awarding the Plaintiff's requested relief.  First, the Supreme Court has recognized a carveout of First Amendment protected speech for defamation.  *See, e.g.*, *Beauharnais v. Illinois*, 343 U.S. 250, 254-55 (1952).  The relevance of this carveout is particularly relevant to this case in light of the Court's conclusion regarding Plaintiff's likelihood of success on its defamation claim.  Finally, the inherently ephemeral nature of a TRO lessens the burden on Mr. Beall of awarding this relief by restricting its effects to only the time until the Court may consider a more robust record.  *See Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 271 (D. Me. 2013) ("In declining to issue a TRO, the Court has focused only on the very narrow time period between today and the date on which the Court is likely to rule on the Plaintiffs' motion for a preliminary injunction.  The TRO is meant for emergencies; it is an extraordinary equitable measure used to forestall irreversible consequences and preserve the status quo for a fuller deliberation of the merits of the case").

### D.    The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

As described above, the limitation on speech implicates the public's free speech rights, as well as the exception to such protection for defamatory speech.  Further,

the Court recognizes a public interest in freedom from harassment, intimidation, ridicule, and insult, both generally in society and especially in the workplace. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) ("[Federal anti-discrimination law] affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult"); *accord Robson v. Shaws Supermarkets Inc.*, 411 F. Supp. 3d 58, 74 (D. Me. 2019) (citing *Meritor Sav. Bank, FSB*, 477 U.S. at 65). Finally, the public has an interest in the effective and efficient management of companies, which includes the difficult reality of terminating employees for cause without fear of public harassment or harassment of remaining employees.

As this private dispute does not weigh heavily on the public interest, "the Court gives little to no weight to the public interest factor." *Waldron v. George Weston Bakeries, Inc.*, 575 F. Supp. 2d 271, 279 (D. Me. 2008). However, insofar as the public interest favors either outcome, the Court concludes it cuts slightly in favor of awarding the TRO.

## IV. SUMMARY

In light of the foregoing factors, the Court concludes that, for the purposes of the requested TRO, EJP has demonstrated a likelihood of success on the merits with regard to its defamation claims for public comments made by Mr. Beall on social media, as well as the likelihood of irreparable harm stemming from such conduct. The Court thus grants Plaintiff's requested TRO with regard to posting defamatory content on public social media sites. *See, e.g.*, *Lynch v. Dukakis*, 719 F.2d 504, 514 (1st Cir. 1983) ("The 'principles of equity jurisprudence' suggest that 'the scope of

injunctive relief is dictated by the extent of the violation established . . . [and] the relief afforded [may not be] more burdensome than necessary to redress the complaining parties'") (citing *Califano v. Yamasaki*, 442 U.S. 682, 702, (1979); *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977)).  The Court concludes it is necessary to issue the order without notice due to Defendant's apparent intentional avoidance of service of the complaint and the irreparable injury to Plaintiff's business reputation that has continued since its filing of the complaint.

The Court declines to issue a TRO with respect to EJP's defamation claim based on direct communications to EJP, its employees, and its counsel, as well as for its claims of tortious interference with advantageous economic relationships and intentional infliction of emotional distress, for failure to demonstrate a likelihood of success on the merits of such claims.

Federal Rule of Civil Procedure 65 permits the issuance of a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *accord Waldron*, 575 F. Supp. 2d at 279.  In this case, EJP noted its willingness to "provide a bond in any amount deemed reasonable by the Court if necessary." *Compl.* ¶ 44.  "Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting a bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove the injunction issued wrongfully.  The bond, in effect, is the moving party's warranty

that the law will uphold the issuance of the injunction." *WEX Inc. v. HP, Inc.*, No. 2:24-cv-00121-JAW, 2024 U.S. Dist. LEXIS 119715, at *99 (D. Me. July 9, 2024) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982)).

However, Plaintiff provided no guidance to assist the Court in determining the appropriate value. In the absence of evidence, the Court resolves to require the Plaintiff to post a $1,000.00 bond, concluding that the damages sustained by Defendant solely because it was wrongly enjoined by the TRO will be minimal and thus covered by the bond amount, while also ensuring that the bond is not cost prohibitive for the Plaintiffs to the effect of making the injunctive relief granted via this order illusory. *See Waldron*, 575 F. Supp. 2d at 279 (ordering the movant to file a $1,000 bond).

As a final note, the Court reminds both parties of the inherently temporary character of the Court's present order, which was issued on short notice and on a limited record to maintain the status quo until the issues can be fully briefed. The scope of the TRO may be either broadened or retracted at the time of conversion into a preliminary injunction. As such, the Court's future determinations with regard to the likely satisfaction of legal elements and the necessity of injunctive relief will necessarily depend on the factual record presented at the hearing and on written motions for summary judgment. Further, the Court puts the parties on notice that their conduct in the interim days until the hearing is held will be considered by the Court as particularly relevant to assessing the need for preliminary injunctive relief.

## V.    CONCLUSION

The Court GRANTS in part and DISMISSES in part Everett J. Prescott, Inc.'s Motion for Temporary Restraining Order (ECF No. 5).  The Court GRANTS the motion insofar as it requests the Defendant be enjoined from posting any defamatory content on public social media sites.  The Court otherwise DISMISSES without prejudice the Motion for Temporary Restraining Order.

Rule 65(b)(3) provides that once if a TRO is issued without notice, a court must set the motion for preliminary injunction "at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character."  FED. R. CIV. P. 65(b)(3).  In accordance with Rule 65(b)(3), as the Court is issuing the TRO without notice, the Court will hold a hearing on the Plaintiff's requested preliminary injunction at the earliest possible time no later than fourteen days of the date of this order.

Finally, under Rule 65(b)(4), if Mr. Beall wishes to have the TRO dissolved, he has a right on two days notice to appear and move to dissolve or modify the order. FED. R. CIV. P. 65(b)(4).  If he does so, the court "must then hear and decide the motion as promptly as justice requires."  *Id.*

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 5th day of March, 2025