UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| EVERETT J. PRESCOTT, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:25-cv-00071-JAW |
| | ) | |
| TIMOTHY J. BEALL, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

In a lawsuit against a former employee, a company and its director of human resources move for a preliminary injunction to prevent the former employee from contacting the company's current employees or customers, entering company premises, and posting any defamatory content on social media. Having previously determined the company demonstrated a likelihood of success on the defamation claim so as to entitle it to a temporary restraining order, the court now converts the temporary restraining order into a preliminary injunction. Further, concluding the plaintiffs' amended complaint establishes their likelihood of success on the tortious interference with advantageous economic relationship claims and intentional infliction of emotional distress with regards the individual plaintiff, the court grants the plaintiffs' request to preliminary enjoin the defendant's statements to company customers and his direct communications with the individual plaintiff.

## I.    PROCEDURAL HISTORY

On March 3, 2025, Everett J. Prescott, Inc. (EJP or the Company) filed a civil complaint against former employee Timothy J. Beall, alleging harassment of the

Company and its employees by Mr. Beall through threatening messages and defamatory statements on social media. *Verified Compl. for TRO and Other Relief* ¶¶ 1-3 (ECF No. 1) (*Compl.*). The complaint asserted claims of defamation per se, tortious interference with advantageous economic relationships, and intentional infliction of emotional distress (IIED), and requested the Court issue a temporary restraining order (TRO) and preliminary injunction. *Id.* at 12-13, 16. In compliance with Federal Rule of Civil Procedure 65, EJP filed a notice on March 4, 2025, informing the Court of its unsuccessful efforts to serve Mr. Beall and its argument for why it should not be required to effect service prior to the Court's issuance of a TRO. *Rule 65(b)(1)(B) Notice Certification* (ECF No. 6).

On March 5, 2025, the Court issued an order granting in part and denying in part EJP's requested TRO. *Order on TRO* (ECF No. 7). The Court concluded EJP had demonstrated a likelihood of success as to its defamation claim for public remarks and granted the requested TRO with regard to posting of defamatory content on public social media sites but dismissed the TRO as to Mr. Beall's private messages to EJP employees. *Id.* at 32-33. The Court further concluded EJP had failed to establish a likelihood of success on its claims of tortious interference with advantageous economic relationships and IIED, respectively, because it presented no evidence of economic harm and because a corporation cannot suffer emotional distress under the law. *Id.* at 33.

On March 10, 2025, EJP filed an amended complaint, adding Paul Van Savage as a co-plaintiff, adding factual allegations relating to events post-dating the filing of

2

the original complaint, and reiterating the request for preliminary injunctive relief. *Verified Am. Compl.* (ECF No. 12) (*Am. Compl.*).

The Court held a hearing on the Plaintiffs' requested preliminary injunction on March 11, 2025. *Min. Entry* (ECF No. 15). Mr. Beall did not appear at that hearing and the record reflected that he had not yet been served. *Id.*; *Proof of Service* (ECF No. 14) (service returned unexecuted). The Court expressed its skepticism over whether it had jurisdiction to issue a preliminary injunction over a defendant who had received notice but had not received service of process, and directed EJP and Mr. Van Savage (together, the Plaintiffs) to return when service had been effected. *Min. Entry.*

Mr. Beall was subsequently served with the summons and complaint on March 12, 2025. *Proof of Service* (ECF No. 17) (service returned executed). On March 18, 2025, the Court held a hearing on the Plaintiffs' request for a preliminary injunction. *Min. Entry* (ECF No. 20). At the hearing, counsel for the Plaintiffs confirmed that they had emailed Mr. Beall with information about the date, time, and place of the hearing. Mr. Beall did not appear.

## II.     STATEMENT OF FACTS

### A.     The Plaintiffs' Verified Amended Complaint

#### 1.     The Parties

EJP is a Maine corporation with a principal place of business in Gardiner, Maine, and Mr. Van Savage, a Maine citizen, works as its Director of Human Resources. *Am. Compl.* ¶¶ 1, 6-7. EJP employed Mr. Beall, a resident of Shrewsbury, Massachusetts, as an inside sales representative from January 2, 2024 until his

termination on November 6, 2024 for poor performance and violations of EJP's attendance policy. *Id.* ¶¶ 8, 11-12.

### 2.    Mr. Beall's Post-Termination Communications

Following his termination, Mr. Beall sent numerous messages to EJP employees, beginning with an email to Mr. Van Savage on December 4, 2024 stating:

> I gave you multiple opportunities, and your demeanor just shows that you are not qualified for your position in the company (as[ ]well as countless other individuals) I feel bad for Peter that this great company he buil[t] was taken over by his spoon fed son who is going to allow his employees to destroy the name his father and grandfather built, but hey like I said previously, I tried to give you guys a change to make things right, thankfully there are laws and my lawyer has a LIST of them EJP violated and violates willingly his quote "it's hilarious how these large companies think the law doesn't matter, then they have their day in court and plead for mercy." He's an absolute pitbull, so we shall see. Be good Paul, see ya in court buddy (I'll be the one grinning from cheek to cheek)[.]

*Id.* ¶ 16.  Mr. Beall again emailed Mr. Van Savage on January 1, 2025 to insult him and EJP, allege legal violations and a cultural crisis within EJP, and note he had discussed his termination with multiple EJP customers.  *Id.* ¶ 17.  Mr. Beall invoked the January 6, 2021 "storming of the Capitol Building" and stated January 6, 2025 "will be a day in EJP history as well, when I file my first case in small claims court for something [you] still have yet to look into."  *Id.*  Mr. Beall sent another email to Mr. Van Savage on January 25, 2025, alleging a racist and unprofessional culture within EJP and threatening legal action against the Company.  *Id.* ¶ 18.

On February 24, 2025, Mr. Beall publicly commented on one of Mr. Van Savage's posts on the social media platform LinkedIn, writing:

> Workplace culture at EJP is having a BurgerKing crown be given to the employee with the most racist comment of the day at Branch 120.  614

4

Hartford Tpk Shrewsbury, MA. Nepotism runs rampant at EJP, which is why James Peterson went from cleaning toilets at a campground to Branch Manager. His uncle who has been ducking summons for a wrongful death case from an EJP employee since 2018 is the Operations Manager. The Business Ethics are nonexistent in this company, that should have been the topic, not [E]mployee Retention. But just like Team EJP to say about instead of be about it. Preach family oriented company, then fire someone for attendance due to a court order to be in court for a case involving the safety of THEIR CHILD. You are pathetic Paul, which is why you fit in so well within the culture at EJP[.]

*Id.* ¶ 19 (emphasis as recounted by Plaintiffs). Mr. Beall was using a trademarked "Team EJP" logo as the banner photograph on his LinkedIn profile at the time he posted this comment. *Id.* ¶ 20.

On February 27, 2025, Plaintiffs' counsel sent a cease-and-desist letter to Mr. Beall "asking him to stop harassing Van Savage and to remove any defamatory public postings." *Id.* ¶ 21 (citing *id.*, Attach. 1, *Cease and Desist Defamatory and Harassing Commc'ns* (*Cease-and-Desist Letter*)). Mr. Beall responded that same day, sending an email to EJP's counsel's paralegal at 3:07 p.m., stating "EJP is full of cowards and the scum of the Earth. If you had any backbone and stood by the LAW you would not represent them, I have faith justice will prevail and if not on this Earth then God will sort it out when that time comes." *Id.* ¶ 22 (emphasis as recounted by Plaintiffs). Defendant sent an additional email to Plaintiffs' counsel's paralegal at 3:42 p.m. that same day, writing:

Wait wait wait wait wait!!! That LinkedIn post is what this is referring to !!!!!?!?!?!? BAHAHAHAHAHAHAHAHHAAHAH OH MY GOD!!!! You have to be joking right? This is going to be laughable in court.[] [Y]ou understand that you are replying to allegations of sexual harassment and direct racism in the work place to an employee who is in a biracial family, WITH A CEASE AND DESIST?????!?!?! Hahahahahah you practice law?? Like seriously actually practice law? Every single page in this story just reveals more and more [] how

5

> obviously it is written as a comedy (by a 3rd grader).  Thank you for this!!  Thank you!  I will go file my 7 lawsuits this week.  Oh my God THANK YOU, you absolutely made my day!!!
>
> WOW!  It's like I'm playing Tee-ball (as a 35 year old, against children), let me say it again……WOW!

*Id.* ¶ 23 (emphasis as recounted by Plaintiffs).  Five minutes later, at 3:47 p.m., Mr. Beall sent a third email to Plaintiffs' counsel's paralegal criticizing the integrity of Plaintiffs' counsel's law firm and Mr. Van Savage.  *Id.* ¶ 24.  Still on February 27, 2025, Defendant additional emails to Plaintiffs' counsel's paralegal at 5:20 p.m. and 7:50 p.m., respectively, alleging corruption at EJP, stating his intent to imminently begin serving EJP employees with summons relating to an alleged wrongful termination lawsuit, alleging a culture of harassment, illegality, and nepotism at EJP, and threatening to expose private information of EJP employees.  *Id.* ¶¶ 26, 29 (citing *id.*, Attach. 2, *External Email* (*Def.'s Emails to Paralegal*)).

Also on February 27, 2025, Mr. Beall also sent a text message to EJP manager James Peterson, informing Mr. Peterson of the Defendant's family connections in law enforcement and private investigations; calling Mr. Peterson "a sexual predator," "loser," and profane names; and threatening him with lawsuits.  *Id.* ¶ 25.  Mr. Beall concluded his message: "YOU PICKED THE WRONG GUY[.]"  *Id.* (emphasis as recounted by Plaintiffs).  The Defendant sent a second message to Mr. Peterson that same day around 8:00 p.m., insulting him, threatening litigation, and alleging sexual harassment of a female employee.  *Id.* ¶ 31.

Still on February 27, 2025, at approximately 8:00 p.m., the Defendant messaged EJP President Steve Prescott:

> I suggest you not be SHORT sighted, and get back to me by oh to make it fun let's say March 15th. With the amount of clowns you have working for you, the fact everything you have was given to you on a silver platter, and being from Maine I can assume you aren't the brightest, look up the Ides of March. Then look into your company, Branch 120, and James Peterson. You're welcome for the warning, it was more than that spineless Porto Potty scrubber James Peterson gave me, but when I bring him to court he will be UNEMPLOYABLE once he is exposed. Paul Van[ ]Savage's (also a tiny pos, there must be a farm up there that pumps you guys out) knowledge of the allegations against James and the nothingness he has done about it is going to taint your company and last name, now that you are aware as[ ]well your next move will ultimately decide the fate of said company.

*Id.* ¶ 30 (emphasis as recounted by Plaintiffs). Plaintiffs interpret Mr. Beall's reference to the Ides of March, the date on which Julius Caesar was assassinated, as a threat of violence. *Id.*

Lastly, still on February 27, 2025, Defendant posted a public comment on EJP's Facebook page alleging EJP rewarded racist comments made in the workplace. *Id.* ¶ 26. He also changed his LinkedIn background photo to read: "Not EJP (They hire sexual predators and are run by corrupt little people)." *Id.* ¶ 28.

On March 1, 2025, Mr. Beall sent a Facebook message to Mr. Prescott, insulting him with profane language and threatening "to destroy [his] company and [his] father's legacy." *Id.* ¶ 36.

EJP then filed its original complaint on March 3, 2025. *Id.* ¶ 37. On the same day, Mr. Beall emailed Mr. Savage profane insults at 8:01 p.m. and again in a separate email at 8:06 p.m., asserting in the latter that Plaintiffs will "have a harder time finding [Defendant] than the courts did to serve Dave the wrongful death paperwork" and adding "**I know where you all live**, he will be getting served his[,] bet on that." *Id.* ¶¶ 38, 39 (Plaintiffs' emphasis).

The Court issued a TRO restraining Mr. Beall from making defamatory public comments about EJP on social media on March 5, 2025, which Plaintiffs' counsel emailed to Mr. Beall that same night. *Id.* ¶¶ 40, 41. At 9:00 p.m. on March 5, 2025, Mr. Beall responded via email, stating:

> Sounds good, see you guys in court. Ultimately all I was looking for was LEGIT[I]MITE response to my wrongful termination. Paul sent a copy and paste of false information, told him that and he ghosted me. They owe me roughly $5 grand, and I have loads of information on their illegal practices including aiding James Peterson in continued sexual harassment (he has restraining order in the girl[']s old Boyfriend now). The place is an absolute joke and their response to legitimate accusations and ask for money OWED is embarrassing. I look forward to exposing it all, have a good day, mine just got infinitely better.

*Id.* ¶ 42 (emphasis as recounted by Plaintiffs).

Based on "the volume of messages, their hostile tone, and the threats contained therein, including the veiled threat of death," Plaintiffs assert that EJP's employees and counsel "reasonably fear for their safety." *Id.* ¶ 43. Plaintiffs add that Mr. Beall's former spouse filed for divorce on November 8, 2024, and that Defendant is the subject of an Abuse Prevention Order from the Massachusetts Probate Court, which Plaintiffs assert further evidences Mr. Beall's "volatile and potentially violent nature." *Id.* ¶¶ 14, 15.

## B.    The March 18, 2025 Hearing on Plaintiffs' Motion for Preliminary Injunction

At the hearing on Plaintiffs' motion for a preliminary injunction, Plaintiffs presented evidence of Mr. Beall's communications to EJP employees and counsel. *See Ex. List* (ECF No. 21). Plaintiffs further called Mr. Van Savage as a witness to testify

as to his knowledge of the events giving rise to this dispute and the effects of Mr. Beall's statements on him and on EJP's business.  *See Witness List* (ECF No. 22).

## III.    THE PARTIES' POSITIONS

### A.    The Plaintiffs' Legal Claims

Plaintiffs request a preliminary injunction, asserting in support that Mr. Beall's actions have caused irreparable harm to EJP and its employees, that they fear he will continue to engage in such conduct without judicial intervention, and that EJP and its employees have suffered, and will continue to suffer, irreparable injury from Mr. Beall's continuing and mounting conduct.[1]  *Am. Compl.* ¶¶ 44-47.  Plaintiffs further allege Mr. Van Savage has suffered or will imminently suffer irreparable injury, including emotional distress, harm to his reputation, and harm to his professional relationships, without an injunction.  *Am. Compl.* ¶ 48.  They continue that there is a substantial likelihood of prevailing on their claims and that no remedy at law could fully compensate the Company for the harms occurring and threatened.  *Id.* ¶¶ 55, 56.  Plaintiffs thus ask the Court for an order "prohibiting Defendant from (a) contacting Van Savage or in any form; (b) entering EJP's company premises; and (c) communicating with EJP or its employees through any means."  *Id.* ¶ 45.

---

[1]    Plaintiffs assert their request for a TRO and preliminary injunction as Count I of their complaint; however, an injunction is a form of relief, not a standalone cause of action.  *See, e.g.*, *Genesis Capital, LLC v. Lauravin Luxury Apartments Homes, LLC*, Civil Action No. 23-795 (JEB), 2023 U.S. Dist. LEXIS 84754, at *6 (D.D.C. May 15, 2023) ("Such an injunction is undoubtedly a 'remedy,' not a cause of action") (citing *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (describing preliminary injunction as "extraordinary remedy")).  The Court thus considers the requested injunction as the relief sought pursuant to the Plaintiffs' remaining claims.

### 1. Defamation Per Se

Turning to its first substantive cause of action, defamation per se, Plaintiffs assert Mr. Beall "negligently, recklessly, and/or intentionally made false statements publicly on social media about EJP's reputation, business, and character," specifying that he "has falsely stated that EJP rewards racism, hires sexual predators, commits crimes, and aides and abets criminal activity." *Id.* ¶¶ 60, 61. Plaintiffs contend these public statements "have a tendency to injure and have in fact injured EJP's reputation." *Id.* ¶ 62. They say that as a direct and proximate result of Mr. Beall's statements, EJP's professional standing has been injured and it has incurred damages. *Id.* ¶¶ 63, 64. As relief for its defamation claim, EJP requests an award of "compensatory damages, including lost earnings opportunities, attorney's fees and costs, and such other and further relief as the Court deems just and proper." *Id.* at 14.

### 2. Tortious Interference with Advantageous Economic Relationship

Next, Plaintiffs bring a claim against Mr. Beall for tortious interference with advantageous economic relationships, alleging EJP has a reasonable expectation of continuing business relations with its clients and that Mr. Beall engaged in tortious conduct "for the purpose of harassing and interfering with the conduct of EJP's business, and with intent to hinder, delay, prevent, threaten, intimidate, and put fear in EJP's employees." *Id.* ¶¶ 66, 67. As a result, Plaintiffs say, Mr. Beall has interfered with "the productivity and business expectancies between EJP and its employees, customers, suppliers, agents, and contractors," and these actions "have damaged, and

. . . will continue to damage the existing and prospective contractual relationships or business expectancies of EJP." *Id.* ¶¶ 68, 69. Mr. Beall's actions have also harmed Mr. Van Savage's "ability to conduct business and maintain his professional reputation at EJP." *Id.* ¶ 70. Plaintiffs allege the Defendant has caused "actual, immediate, and irreparable harm for which EJP has no adequate remedy at law," and asks the Court to award a preliminary and permanent injunction and damages in an amount to be proven at trial. *Id.* ¶¶ 71, 72.

### 3.    Intentional Infliction of Emotional Distress

Finally, Plaintiffs assert an IIED claim against Mr. Beall, alleging that he "engaged in conduct that intentionally or recklessly caused emotion[al] distress to Mr. Van Savage" and that Defendant did so while "certain or substantially certain that severe emotional distress would result from his conduct." *Id.* ¶ 74. Plaintiffs describe Mr. Beall's conduct as "so extremely outrageous so as to exceed all possible bounds of decency," *id.* ¶ 75, and tell the Court that, as a result of Defendant's actions, Mr. Van Savage "suffered and continues to suffer severe emotion[al] distress" to a degree "that no reasonable person could be expected to endure it" and "reasonably fears for his safety." *Id.* at ¶¶ 76-78. Plaintiffs ask for judgment "in an amount which will fairly compensate [Mr. Van Savage] for [his] damages, as well as punitive damages, and any other relief deemed just plus an award of costs and attorney's fees." *Id.* at 18.

11

### 4.    Requested Relief

Plaintiffs' amended complaint requests five distinct forms of relief.  First, they ask the Court to enjoin Mr. Beall from "a) Contacting Van Savage; b) Entering EJP's company premises; c) Communicating with EJP or its employees through any means; and d) Posting any defamatory content on public social media sites."  *Id.* at 18. Second, they request the Court enter a permanent injunction of the same conduct. *Id.*  Third, Plaintiffs ask the Court to issue an order requiring all federal law enforcement officers to enforce the injunction "to the extent of their lawful authority." *Id.*  Fourth, Plaintiffs request an award of reasonable attorney's fees and costs.  *Id.* at 19.  Fifth, Plaintiffs ask for any other relief the Court "may deem just, equitable, and proper."  *Id.*  As a final note, Plaintiffs also request a jury trial on all issues for which a jury trial is permissible.  *Id.*

## IV.    LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right."  *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).  To determine whether to issue a preliminary injunction, a court must analyze four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

12

*Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Id.* at 18 (citing *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *accord Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is "the most important part of the preliminary injunction assessment" (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2008)).

Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). For the Court to grant the motion for preliminary injunction, the Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility. *Winter*, 555 U.S. at 22 (emphasis in original); *accord Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is

13

insufficient to justify an injunction"). Courts "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'" *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)). Thus, "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown;" however, "at least some positive showing of irreparable harm must still be made." *Id.* at 43 (internal quotation omitted) (alteration in original); *accord Gately v. Mass.*, 2 F.3d 1221, 1232 (1st Cir. 1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief").

The First Circuit has termed the third factor the "balance of relevant impositions," assessing "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." *Monroig-Zayas*, 445 F.3d at 18 (quoting *Bl(a)ck Tea Soc'y*, 378 F.3d at 11) (internal quotations omitted). The Court must weigh the balance of equities to determine whether the injury to the plaintiff in the absence of a preliminary injunction outweighs any harm to the defendant if granted.

The final factor is the public interest. This factor requires the Court to "inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005). "In exercising their sound

discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

## V.     DISCUSSION

As in the Court's order on the motion for TRO, the Court considers first the likelihood of success for each of the Plaintiffs' claims based on their respective elements, before proceeding to consider the remaining factors of potential for irreparable harm to the Plaintiff, balance of the equities, and effect on the public interest.    Although the legal standard for a TRO and preliminary injunction is identical, *Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013) ("The standard for issuing a temporary restraining order is the same as for a preliminary injunction"), the Court incorporates and amends its analysis from its order on the TRO to consider the addition of Mr. Van Savage, who had not joined the suit at the point the Court issued the TRO in this case, as well as additional facts pleaded in the amended complaint and at the hearing on the motion for preliminary injunction.

### A.     Likelihood of Success on the Merits

Within the First Circuit, a likelihood of success on the merits is both the "sine qua non" and the "most important part of the preliminary injunction assessment"; the First Circuit has explained that "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Sindicato Puertorriqueño de Trabajadores*, 699 F.3d at 7, 10 (quoting *Jean*, 492 F.3d at 27; *New Comm Wireless Servs. Inc.*, 287 F.3d at 9.  To carry his burden on this factor, a plaintiff "must establish a 'strong likelihood' that he will

ultimately prevail." *Id.* at 10 (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).  The Court thus considers the likelihood of success of each of the Plaintiffs' substantive causes of action in turn.

### 1.    Defamation Per Se

#### a.    Legal Elements

The Maine Supreme Judicial Court, sitting as the Law Court, has defined a defamation claim as having four requisite elements:

> (1) a false and defamatory statement concerning another;
>
> (2) an unprivileged publication to a third party;
>
> (3) fault amounting at least to negligence on the part of the publisher; [and]
>
> (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Garey v. Stanford Mgmt., LLC*, 2024 ME 46, ¶ 8, 319 A.3d 1022 (citing *Waugh v. Genesis Healthcare LLC*, 2019 ME 179, ¶ 10, 222 A.3d 1063) (alteration in original)). To constitute defamation, "the statements must be more than mere opinions and constitute either explicit or implicit assertions of fact"; however, "an opinion implying the existence of undisclosed defamatory facts does not escape liability." *Id.* (citing *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991); *Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 784 (Me. 1984)).

Such statements, when "written falsely about a person's profession, occupation, or official station constitute [defamation] per se." *Id.* (quoting *Ballard v. Wagner*, 2005 ME 86, ¶ 10, 877 A.2d 1083).  In the defamation per se context, "a plaintiff need not prove special damages or malice in order to recover a substantial

16

award." *Marston v. Newavom*, 629 A.2d 587, 593 (Me. 1993) (citing *Saunders v. VanPelt*, 497 A.2d 1121, 1126 (Me. 1985)).  In such cases, "[i]njury to reputation and injury to feelings may be presumed from the publication of the defamatory statement." *Id.*

> **b.  Analysis**
>
> **i.  False and Defamatory Statements Concerning Another**

Based on the record before it, the Court considers whether Plaintiffs have established that Mr. Beall made statements against EJP that were false and "tend[] . . . to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Bakal v. Weare*, 583 A.2d 1028, 1029 (Me. 1990) (quoting Restatement (Second) of Torts § 559 (Am. L. Inst. 1977)).

Plaintiffs allege that Defendant's public comment on LinkedIn on February 24, 2025 "falsely accus[ed] EJP of condoning racism, falsely accus[ed] an EJP employee of committing a crime, and falsely accus[ed] EJP of preventing him from attending court," and that his public comment on EJP's Facebook page on February 27, 2025 "falsely accus[ed] EJP of rewarding racism in the workplace." *Am. Compl.* ¶¶ 19, 27. Specifically, Plaintiffs say "Defendant has falsely stated that EJP rewards racism, hires sexual predators, commits crimes, and aides and abets criminal activity." *Id.* ¶ 61. For the purpose of this order, the Court concludes that Plaintiffs have sufficiently alleged false statements made concerning another—here, EJP—and turns to consider whether these false statements were defamatory.

The Maine Supreme Judicial Court has incorporated the definition of a "defamatory communication" from the Restatement (Second) of Torts as a statement which "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (AM. L. INST. 1977). The Restatement (Second) explains that "[t]he question to be determined is whether the communication is reasonably understood in a defamatory sense by the recipient." *Id.* § 563 cmt. c. The Restatement (Second) defines defamation specifically in the context of a corporation as "if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it." *Id.* § 561(a); *accord Bruno v. Corrado*, No. CV-14-429, 2015 Me. Super. LEXIS 12, at *7-8 (Jan. 5, 2015) (quoting Restatement (Second) of Torts § 561).

Here, the Court concludes based on the record before it that Plaintiffs sufficiently established that Mr. Beall's statements "have a tendency to injure and have in fact injured EJP's reputation" and that "EJP has been injured in its professional standing and reputation." *Am. Compl.* ¶¶ 62, 63. Of particular concern is Mr. Beall's assertion, as reported by the Plaintiffs, that he has shared his allegations directly with EJP's customers, *id.* ¶ 17, and his public comments on social media alleging sexual misconduct and racism. *Id.* ¶¶ 19, 27-28. The Court concludes Plaintiffs reasonably perceived the negative reputational effects of Mr. Beall's statements to EJP's current customers and his public comments on social media, the latter evidenced by Mr. Van Savage's witness statements that Mr. Beall's social

18

media comments would be visible to any person with a social media profile who is a "connection" or "follows" the EJP profile, a group of approximately nine hundred which Mr. Van Savage represented includes current and potential EJP customers and employees. It is logical that the community would respond negatively and avoid doing business with a company accused of supporting a culture of racism, sexual harassment, and criminality.

### ii.    Publication to a Third Party

The Law Court has adopted the Restatement (Second) of Torts § 577 in the state of Maine, which states "[p]ublication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." Restatement (Second) of Torts § 577; *see also Heselton v. Wilder*, 496 A.2d 1063, 1067 (Me. 1985) (citing Restatement (Second) of Torts § 577); *Bedard v. Greene*, 409 A.2d 676, 678 n.4 (Me. 1979) (same).

The amended complaint alleges Mr. Beall made four distinct types of statements: statements to EJP customers, public comments on social media, emails to Plaintiffs' counsel's paralegal, and direct messages to EJP employees.

First, the Court deems statements made by Mr. Beall to EJP's current customers undeniably published to a third party. As Mr. Beall himself wrote in an email, he has been telling EJP customers "how much of low life scum bags you all are." *Am. Compl.* ¶ 17. Though he does not disclose specific details of what he told EJP customers, the Court infers from the context of the allegations repeated by Mr. Beall in his direct communications and social media posts that he may have alleged

19

sexual misconduct, racism, and corruption at the Company. For the purposes of proving the publication element, by his own admission, Mr. Beall intentionally made these statements to persons other than EJP.

The Court also concludes Plaintiffs have demonstrated publication with regard to Mr. Beall's public comments regarding EJP on social media. LinkedIn and Facebook are public platforms, such that Mr. Beall's statements, including his allegations that the Company "hire[s] sexual predators and are run by corrupt little people," that they reward racist conduct, and that their corporate culture encourages nepotism and illegality, were published to persons other than the person being defamed. *See id.* ¶¶ 19, 27-28.

However, the Court concludes Plaintiffs have not established publication with regard to Mr. Beall's direct communications with EJP's employees and counsel. Beginning with his messages to Plaintiffs' counsel through its paralegal, counsel was acting on behalf of EJP in sending the cease-and-desist letter that prompted the responsive emails from Mr. Beall. *See Cease-and-Desist Letter*. According to caselaw from the Maine Supreme Judicial Court, a lawyer acting on behalf of a client is an agent of that client. *Cf. Berman v. Griggs*, 145 Me. 258, 262-63; 75 A.2d 365 (1950) (law of principal and agent applies when lawyer acts on behalf of client); *Mockus v. Melanson*, 615 A.2d 245, 247 (Me. 1992) (attorney's actions "are to be regarded as the acts of the party represented"). Mr. Beall's statements responding to Plaintiffs' counsel, through its paralegal, were thus essentially made to EJP itself. Under defamation law of the state of Maine, a defamatory statement is only "published" if

made to "one other than the person defamed." Restatement (Second) of Torts § 577. To issue a preliminary injunction, the Court must be satisfied that the movant has a likelihood of success. The Court is doubtful whether — absent unusual circumstances not present here — a statement made to a victim's attorney constitutes publication in the context of a defamation claim, and Plaintiffs' counsel have failed to provide any authority for the Court to conclude otherwise.

Similarly, the Court concludes Plaintiffs have failed to demonstrate publication with regard to Mr. Beall's direct messages to EJP employees. Statements implicating the corporate culture and professionalism of EJP and certain employees were made directly to the implicated employees, and only those employees. Plaintiffs present no evidence these messages were communicated to "one other than the person being defamed." Restatement (Second) of Torts § 577. Specifically, Mr. Beall's emails to Mr. Van Savage on December 4, 2024, January 1, 2025, and January 25, 2025 allege impropriety by EJP's Human Resources Department, headed by Mr. Van Savage himself. *Am. Compl.* ¶¶ 16-18. Mr. Beall's statements on February 27, 2025 accusing Mr. Peterson of sexual misconduct and threatening legal action were similarly sent directly and exclusively to Mr. Peterson. *Id.* ¶¶ 25, 31. In the same vein, Mr. Beall's message to Mr. Prescott on February 27, 2025 alleging mismanagement of the Company was sent to the Company President, and thus was not published to a third party as would affect EJP's public reputation. *Id.* ¶ 30.

The Court concludes Mr. Beall's statements to EJP clients and his public comments on LinkedIn and Facebook likely satisfy the standard for publication to a

third party, whereas his emails to Plaintiffs' counsel through its paralegal and his direct messages to EJP employees do not.

### iii.        Fault Amounting to At Least Negligence

Restatement (Second) of Torts § 580B contemplates liability for defamatory statements made under three circumstances: the speaker "(a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." Restatement (Second) of Torts § 580B.

In this case, the Court reaches the unavoidable conclusion that Mr. Beall made his statements intentionally. The relevant question is thus whether Mr. Beall knew his statements regarding racist workplace culture, sexual harassment, and nepotism at EJP were false at the time he made the statements, or, alternatively, whether he acted recklessly or negligently in ascertaining their truth. Section 580B of the Restatement (Second) incorporates the standard for "knowledge or reckless disregard of falsity" from comment (d) to Restatement (Second) of Torts § 580A, which states:

> Reckless disregard is held not to be measured by whether a reasonable, prudent person would have published the statement without more investigation. Reckless disregard is said to exist, however, when there is "a high degree of awareness of . . . probable falseness" of the statement, or there are "serious doubts as to [its] truth." Availability of sufficient time and opportunity to investigate the truth of the statement is a significant factor in determining whether the publisher was negligent . . ., and it may have some relevance in determining whether the publisher acted with reckless disregard as to truth or falsity.

Restatement (Second) of Torts § 580A cmt. d. This comment continues to state "[r]epublication of a statement after the defendant has been notified that the plaintiff

22

contends that it is false and defamatory may be treated as evidence of reckless disregard." *Id.*

Here, Mr. Beall published his first LinkedIn comment on February 23, 2025, after which EJP sent him a cease-and-desist letter informing him of the falsity of his allegations and demanding he stop making such statements. *Cease-and-Desist Letter* at 1-4. In response, on February 27, 2025, Mr. Beall made additional public allegations on Facebook, *id.* ¶ 27, and changed his LinkedIn background image to accuse EJP of "hir[ing] sexual predators and [being] run by corrupt little people." *Id.* ¶ 28. Under the Restatement (Second), republishing a statement after being informed of its false and defamatory nature may be taken as evidence of reckless disregard for its falsity. Restatement (Second) of Torts § 580A cmt. d. The Court thus concludes that Plaintiffs have sufficiently established, for the purposes of a preliminary injunction, that Mr. Beall published his defamatory statements concerning EJP on LinkedIn and Facebook with reckless disregard as to their truth or falsity.

### iv.    Special Harm

Maine courts have consistently held that "[i]njury to reputation and injury to feelings may be presumed from the publication of the defamatory statement" for statements "written falsely about a person's profession, occupation, or official station." *See, e.g., Ballard*, 2005 ME 86, ¶ 10, 877 A.2d 1083; *Marston*, 629 A.2d at 593 (citing *Saunders*, 497 A.2d at 1126). The Restatement (Second) of Torts also specifically addresses reputational harm in the context of corporations, writing "[a]

corporation for profit has a business reputation and may therefore be defamed in this respect. Thus, a corporation may maintain an action for defamatory words that discredit it and tend to cause loss to it in the conduct of its business, without proof of special harm resulting to it." Restatement (Second) of Torts § 561 cmt. b; *see Bruno*, 2015 Me. Super. LEXIS 12, at *7-8.

Mr. Beall's allegations of serious violations of workplace ethics and the law by EJP plainly implicate the Company's professional reputation. *See, e.g.*, *Am. Compl.* ¶¶ 16-42. The Court thus concludes it may presume reputational injury based on the content of Mr. Beall's statements, such that Plaintiffs have satisfied their burden of demonstrating harm to EJP for the purposes of its defamation per se claim in the context of its requested preliminary injunction.

### c.    Conclusion

At bottom, the Court concludes Plaintiffs have demonstrated a likelihood of success on the merits for their defamation per se claim with regard to Mr. Beall's statements to EJP's customers and his public-facing statements on social media. His statements made directly to Plaintiffs' counsel and to EJP employees, however, have not been proven likely to succeed on the merits of a defamation per se claim for lack of publication based on the record currently before the Court.

### 2.    Tortious Interference with Advantageous Economic Relationship

### a.    Legal Elements

Under Maine law, "interference with an advantageous relationship requires the existence of a valid contract or prospective economic advantage, interference with

that contract or advantage through fraud or intimidation, and damages proximately caused by the interference." *Barnes v. Zappia*, 658 A.2d 1086, 1090 (Me. 1995); *accord Harlor v. Amica Mut. Ins. Co.*, 2016 ME 161, ¶ 12, 150 A.3d 793.

The Law Court held in *Harlor* that "a plaintiff can make out a claim for this tort by alleging either (a) that the defendant interfered with the plaintiff's advantageous relationship with a third party by committing fraud or intimidation against the third party or (b) that the defendant interfered with the plaintiff's relationship with a third party by committing fraud or intimidation against the plaintiff." *Harlor*, 2016 ME 161, ¶ 13, 150 A.3d 793 (citing *O'Donnell v. Boggs*, 611 F.3d 50, 54 (1st Cir. 2010); Restatement (Second) of Torts §§ 766A, 766B (AM. LAW INST. 1979)).

To evaluate the propriety of intentional interference with the contractual relations of another, a court considers "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." Restatement (Second) of Torts § 767.

### b.    Analysis

#### i.    Existence of Contract or Prospective Advantage

Plaintiffs claim EJP has "a reasonable expectation of continued business relations with its existing and prospective clients" and assert Mr. Beall's statements "tort[i]ously interfered with the productivity and business expectancies between EJP

25

and its employees, customers, suppliers, agents, and contractors." *Compl.* ¶¶ 66, 68. For the purpose of the present motion, the Court accepts as true Plaintiffs' assertion that EJP has contracted with customers and anticipates prospective contracting opportunities as the purpose of the Company.

### ii.    Interference Through Fraud or Intimidation

The Law Court has indicated tortious interference may be proven through two means: fraud or intimidation. *Barnes*, 658 A.2d at 1090. For interference by fraud, the *Harlor* Court explained, a person must "(1) make[] a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing another to act or to refrain from acting in reliance on it; and (5) the third person . . . justifiably relies on the representation as true and acts upon it, damaging the plaintiff." *Harlor*, 2016 ME 161, ¶ 34, 150 A.3d 793 (citing *Petit v. Key Bank of Me.*, 688 A.2d 427, 430 (Me. 1996)).

In this case, Plaintiffs assert Mr. Beall's allegations of sexual misconduct, racism, nepotism, and other unprofessionalism at EJP are false and he has been informed of their falsity through the cease-and-desist letter. *See, e.g.*, *Am. Compl.* ¶¶ 19, 27-28, 60-61; *Cease-and-Desist Letter*. At the hearing on Plaintiffs' motion for preliminary injunction, Mr. Van Savage testified that such statements were false. Based on the record presented, the Court accepts Plaintiffs' representations of falsity and concludes that the statements are material to the Company's reputation and, further, were made with reckless disregard to their truth after Mr. Beall was provided with the cease-and-desist letter.

26

Further, the record establishes that Mr. Beall made his statements with the intent of affecting EJP's business with its current customers. In his own words, Mr. Beall desires to "wipe Team EJP out of central Massachusetts." *Am. Compl.* ¶ 4. Further, Mr. Beall made his social media comments on EJP's and Mr. Van Savage's public profiles in full view of EJP's current and potential customers, including a comment on, as Mr. Van Savage explained in his in-court testimony, a post by Mr. Van Savage from over a year prior that would have required affirmative searching to be found. *Id.* ¶¶ 19, 27-28. As Mr. Van Savage testified, such social media comments may be seen by all parties who are "connected" with or "follow" EJP's social media accounts. Mr. Van Savage testified that EJP has "connections" on Facebook and "followers" on LinkedIn in the range of 800 to 900 persons, respectively, many of whom constitute current or potential EJP customers. As such, Mr. Beall's social media comments targeted an audience of those in business, or with the potential to enter business, with EJP. At the preliminary injunction hearing, Mr. Van Savage testified as to the effect of Mr. Beall's statements to customers and on social media, asserting allegations of sexual and racist misconduct and corruption would be certain to harm EJP's business. Finally, the Court observes that Mr. Beall was formerly employed at EJP, and some persons will assume that his extreme criticisms about the EJP workplace must reflect the truth of his experience there, thereby giving his comments inherent credibility.

Based on the record, the Court can reasonably infer that Mr. Beall's allegations of sexual misconduct, racism, and corruption would induce current and potential

customers to refrain from engaging in business with EJP and that making such statements directly to customers and in social media posts visible to current and potential customers would be relied upon by third parties to decline to do business with EJP.  The Court makes this finding despite the absence of any direct evidence that Mr. Beall has caused EJP to lose any specific customer.  The comments are so virulent that some customers who have a choice between EJP and unsullied competitors may choose the competitor.  The Court does not conclude that EJP must wait to actually lose customers in order to demonstrate that, absent an injunction, it will be harmed.  As such, EJP has likely been, and will continue to be, harmed through an incalculable loss of business opportunities with existing and potential customers.  Because the Court concludes Plaintiffs have established a likelihood of success on their claim for tortious interference with advantageous economic relationships based on fraud, it declines to reach the question of interference by intimidation.

As a final note on this claim, the Court again recognizes a distinction between statements made directly and exclusively to EJP employees and statements made publicly.   As the *Harlor* Court explained, to bring a tortious interference claim, a plaintiff must demonstrate "the third person . . . justifiably relies on the representation as true and acts upon it, damaging the plaintiff."  *Harlor*, 2016 ME 161, ¶ 34, 150 A.3d 793 (citing *Petit*, 688 A.2d 427, 430).  Statements made only to EJP employees do not reach third parties, and thus cannot be relied on by third parties as the basis for ceasing and existing, or declining a prospective, economic

relationship. Thus, Plaintiffs have failed to demonstrate a likelihood of success based on Mr. Beall's direct messages to EJP employees. The same cannot be said of Mr. Beall's statements made directly to EJP customers or made on public-facing social media, which certainly reached third-party ears and could have been justifiably relied on as the basis for refusing to do business with EJP.

### c.      Conclusion

The Court concludes, for the purposes of a preliminary injunction, that Plaintiffs have demonstrated a likelihood of success on their tortious interference with an advantageous economic relationship claim by presenting evidence of the intentional and deleterious effect on EJP's business of Mr. Beall's statements directly to EJP customers and on public social media.

### 3.      Intentional Infliction of Emotional Distress

### a.      Legal Elements

To prove an IIED claim, a plaintiff must present factual support for the conclusion that:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable person could be expected to endure it."

*Curtis v. Porter*, 2001 ME 158, ¶ 16, 784 A.2d 18 (citing *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 15, 711 A.2d 842); *accord Bratton v. McDonough*, 2014 ME 64, ¶ 22, 91 A.3d 1050. "The determination of whether the facts alleged are sufficient

29

to establish that the defendant's conduct is 'so extreme and outrageous to permit recovery' is a question of law for the court to decide." *Argereow v. Weisberg*, 2018 ME 140, ¶ 27, 195 A.3d 1210 (quoting *Champagne*, 1998 ME 87, ¶ 16, 711 A.2d 842).

### b.    Analysis

Plaintiffs assert Mr. Beall intentionally or recklessly caused emotional distress to Mr. Van Savage through his repeated threatening messages. *Am. Compl.* ¶¶ 73-78. Mr. Van Savage further testified that he fears for his physical safety and has suffered significant emotional distress resulting in a loss of sleep, loss of appetite, drastic weight loss, interference with the quality of his work, and his hiring of private security.

Based on the record before it, the Court concludes that Mr. Beall intentionally or recklessly inflicted emotional distress on Mr. Van Savage. Mr. Beall's repeated and harassing messages to Mr. Van Savage, persisting after the cease-and-desist letter, allege serious misconduct with an undertone of threatened violence, including by reference to "storming of the Capitol Building" and, most notably, informing Mr. Van Savage that he knows where he lives. *Am. Compl.* ¶¶ 17, 39. The Court reasonably infers such threats would be substantially certain to cause the recipient severe emotional distress, an inference corroborated by Mr. Van Savage's testimony regarding the numerous physical and emotional consequences of Mr. Beall's conduct.

Further, the Court concludes Mr. Beall's conduct "exceed[s] all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community." *Curtis*, 2001 ME 158, ¶ 16, 784 A.2d 18 (citing *Champagne*, 1998 ME

87, ¶ 15, 711 A.2d 842).   In response to his termination for performance and attendance issues, Mr. Beall has, over a period of four months, repeatedly sent Mr. Van Savage profane and insulting messages employing explicit language, threats of litigation, and, in his most recent message, implying he knows Mr. Van Savage's residential address and calling him homophobic slurs. *Am. Compl.* ¶¶ 17-18, 38-39. Mr. Beall's conduct is, simply put, indefensible and unacceptable in a civilized society.

Turning to evidence of Mr. Van Savage's emotional distress, the Court accepts, at this stage, Mr. Van Savage's testimony that he has suffered from significant interference with his sleep, diet, and professional productivity as a result of Mr. Beall's conduct, including such fear for his physical safety that he retained private security.  The emotional distress suffered by Mr. Van Savage, further, goes beyond what a reasonable person should be expected to endure.  An employee—specifically, a Director of Human Resources—must be permitted to do their jobs and to terminate employees as necessary without fear of being personally harassed and threatened with violence.  Here, Mr. Van Savage's diligent exercise of his professional duties triggered a months-long and still ongoing campaign of harassment by Mr. Beall and resulted in his losing, by his estimate, thirty pounds and waking up on a nightly basis out of fear for his physical safety and professional reputation.  No person could be reasonably expected to endure such emotional distress for merely doing his or her job.

### c.    Conclusion

The Court thus concludes Plaintiffs have demonstrated a likelihood of success on the merits of their IIED claim regarding communications made to Mr. Van Savage.

The Court now turns to consider the remaining factors relevant to issuing a preliminary injunction.

## B.    Likelihood of Irreparable Harm

Plaintiffs seeking preliminary injunctive relief must demonstrate "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original).  "[I]rreparable harm can consist of 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'" *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (*Ross-Simons II*) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (*Ross-Simons I*)).  "[D]istrict courts have broad discretion to evaluate the irreparability of alleged harm." *Ross-Simons II*, 217 F.3d at 13 (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989)).  The Court considers the likelihood of irreparable harm to each plaintiff in turn.

### 1.    Everett J. Prescott, Inc.

Plaintiffs assert Mr. Beall's statements cause "harm to [EJP's] goodwill and business expectations, which will continue during the pendency of this matter if Defendant is not enjoined from further unlawful conduct." *Am. Compl.* ¶ 47.  In this District, irreparable harm to a corporation "should ordinarily be capable of description as profound and threatening to the business's continued viability, or at least seriously disruptive to the ordinary operation of the market for its services."

*Curo Health Serv. LLC v. Lilly*, No. 1:24-cv-417-LEW, 2024 U.S. Dist. LEXIS 233767,
at *9 (D. Me. Dec. 30, 2024) (citing *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d
464, 485 (1st Cir. 2009) (collecting exemplar cases)).

In this case, the Court concludes Plaintiffs are reasonably concerned that
allegations of corruption, nepotism, racism, and sexual harassment at the Company
would seriously disrupt the market for its services.  A professional reputation and
client relationships take time and effort to develop, and even a hypothetical future
dismissal of allegations in court may not serve to rebuild goodwill with existing or
potential clients that was affected by the initial allegations.  The *Curo* Court
dismissed a motion for preliminary injunction on the basis that, should liability be
proven, "a damages remedy could be computed and awarded" by determining the
costs related to "the loss of a hospice patient it was otherwise prepared to serve."  *Id.*
at *14.  Here, EJP may be able to prove economic damages relating to the cancellation
of any existing contracts on the basis of Mr. Beall's statements, but it would be nearly
impossible to accurately calculate, in monetary terms, the damage of prospective
contracting opportunities foreclosed by Mr. Beall's allegations.  This incalculable and
irreparable harm cuts in favor of Plaintiffs' requested preliminary injunction.

### 2.    Mr. Van Savage

Plaintiffs allege Mr. Beall's conduct harms Mr. Van Savage's "ability to conduct
business and maintain his professional reputation at EJP," causes him "severe
emotion[al] distress," and that he fears for his safety.  *Am. Compl.* ¶¶ 70, 76, 77.

The First Circuit has held that, "[b]ecause injuries to goodwill and reputation are not easily quantifiable, courts often find this type of harm irreparable." *Ross-Simons II*, 217 F.3d at 13 (citations omitted). As such, Mr. Van Savage's alleged injury to his professional reputation likely constitutes irreparable harm.

Further, District of Maine caselaw has described the standard for a likelihood of irreparable harm as "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant. Thus, a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown." *United States v. Miles*, 238 F. Supp. 2d 297, 302 (D. Me. 2002) (quoting *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001) (in turn quoting 11A Charles Alan Wright, et al., FEDERAL PRACTICE AND PROCEDURE: Civil 2d § 2948.1 at 153-56)). Here, Plaintiffs have presented evidence of threats of violence against Mr. Van Savage, including an assertion by Mr. Beall that he knows where Mr. Van Savage lives. *Am. Compl.* ¶ 39. Plaintiffs have therefore presented an actual and present threat to Mr. Van Savage's safety that weighs in favor of the requested injunctive relief.

### 3.    Conclusion

In sum, the Court concludes that Plaintiffs have demonstrated a likelihood of irreparable reputational harm to EJP and Mr. Van Savage absent their requested injunctive relief that weighs in favor of a preliminary injunction.

### C.    The Balance of the Equities

To obtain preliminary injunctive relief, a plaintiff must also show "the balance of equities tips in [its] favor." *Winter*, 555 U.S. at 20. This involves weighing "the balance of relevant hardships as between the parties." *Vaqueria Tres Monjitas, Inc.*, 587 F.3d at 482.

A preliminary injunction, Plaintiffs insist, would "not cause financial loss or damage to Defendant but will protect EJP's business and its employees from further irreparable harm." *Am. Compl.* ¶ 50. As discussed above, the Court agrees with Plaintiffs' argument that Mr. Beall's allegations undercut the Company's ability to conduct a profitable business and may cause permanent reputational harm, unmitigated by the possibility for Plaintiffs' success on its claims in court. Similarly, Mr. Van Savage's testimony demonstrates that Mr. Beall's conduct has interfered with his ability to work by disrupting his diet, sleep, and presenting a threat to his safety that led him to retain private security.

Furthermore, on the record before it, the Court identifies no significant hardship to Mr. Beall as a result of the requested preliminary injunction. An injunction would maintain the status quo until the Court can evaluate the propriety of more permanent injunctive relief by considering a more robust record; it would not prejudice Mr. Beall from bringing the lawsuits he references in his messages, nor would it interfere with any of his apparent economic interests. Indeed, the only purpose of the defamatory conduct the Court can discern is to threaten and insult EJP and its employees and interfere with its business. The current record contains

no suggestion that Mr. Beall's conduct is part and parcel of his own business efforts, such that restraining him would impede his own ability to make a living.

The Court recognizes that a contemplated restriction on speech implicates Mr. Beall's First Amendment rights. However, the Court concludes the balance of the equities nonetheless favors awarding the Plaintiffs' requested relief. First, defamatory speech is not protected under the First Amendment. *See, e.g.*, *Beauharnais v. Illinois*, 343 U.S. 250, 254-55 (1952). This carveout is particularly relevant to this case in light of the Court's conclusion regarding Plaintiffs' likelihood of success on their defamation claim. Second, a preliminary injunction is not permanent, but merely preserves the status quo until a time when the factfinder may resolve the dispute on a full and complete record while pausing any potential for irreparable harm. *See CMM Cable Rep., Inc. v. Ocean Coast Props.*, 48 F.3d 618, 620 (1st Cir. 1995) ("The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs. The court's interim injunctive decree attempts to prevent further injury by maintaining the status quo") (internal citations omitted); *accord Outside TV, Inc. v. Murin*, 977 F. Supp. 2d 1, 7-8 (D. Me. 2013).

Although, in his missives, Mr. Beall welcomed the opportunity to litigate these issues with EJP in court, he has thus far not appeared to defend himself, and, therefore, the Court has learned of the facts only through EJP's perspective. Despite this preliminary injunction, Mr. Beall still has the right to appear either though

36

counsel or by himself to contest this injunction and to explain and justify his conduct. This preliminary injunction does not predict the end result if Mr. Beall elects to defend himself.

The Court concludes the balance of the equities favors granting the Plaintiffs' request for a preliminary injunction.

### D.    The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

As noted above, the limitation on speech implicates the public's free speech rights.  The public also has a shared interest in freedom from harassment, intimidation, ridicule, and insult, both generally at a societal level and especially in the workplace.  *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) ("[Federal anti-discrimination law] affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult"); *accord Robson v. Shaws Supermarkets Inc.*, 411 F. Supp. 3d 58, 74 (D. Me. 2019) (citing *Meritor Sav. Bank, FSB*, 477 U.S. at 65).  The public also has a shared economic interest in the effective and efficient management of companies, which necessarily includes terminating employees for cause without fear of public harassment or direct harassment of current employees.

Ultimately, the Court concludes this private dispute does not weigh heavily on the public interest, such that "the Court gives little to no weight to the public interest factor." *Waldron v. George Weston Bakeries, Inc.*, 575 F. Supp. 2d 271, 279 (D. Me. 2008). What little weight is accorded to this factor, the Court concludes, cuts marginally in favor of awarding the preliminary injunction.

## VI.    SUMMARY

In light of the foregoing factors, the Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits with regard to their claims of defamation and tortious interference with advantageous economic relationships based on Mr. Beall's statements to EJP's customers and his public comments made on social media, as well as the likelihood of irreparable harm to the Company's reputation stemming from such conduct. The Court thus grants Plaintiffs' requested preliminary injunction with regard to defamatory statements about EJP to its current customers and posting defamatory content on public social media sites.

The Court further grants the Plaintiffs' request for a preliminary injunction for communications sent to Mr. Van Savage, concluding Plaintiffs have established a likelihood of success on the merits of their IIED claim and an injunction is justified to prevent ongoing irreparable emotional and reputational harm to Mr. Van Savage.

The Court declines to enjoin Mr. Beall from communicating directly with EJP employees not named as parties to this case for failure to demonstrate such statements have been published as required to succeed on a defamation claim, or that such direct communications have interfered with EJP's business on the tortious interference claim. *See, e.g.*, *Lynch v. Dukakis*, 719 F.2d 504, 514 (1st Cir. 1983) ("The

38

'principles of equity jurisprudence' suggest that 'the scope of injunctive relief is dictated by the extent of the violation established . . . [and] the relief afforded [may not be] more burdensome than necessary to redress the complaining parties'") (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977)).

## VII.  CONCLUSION

The Court GRANTS in part and DISMISSES in part the Plaintiffs' Motion for Preliminary Injunction (ECF No. 5), as articulated in their amended verified complaint.  The Court GRANTS the motion with regard to Mr. Beall's defamatory statements regarding Everett J. Prescott to the Company's current customers, his posting of defamatory content on public social media sites, and his contacting Mr. Van Savage.  The Court DISMISSES the motion without prejudice with regard to the requested injunction of Mr. Beall from entering the Everett J. Prescott premises or communicating with Everett J. Prescott employees other than Mr. Van Savage.

The Court issues the preliminary injunction separately from this order.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of March, 2025